# Exhibit A

SUPREME COURT OF THE STATE OF NEW YORK
DUTCHESS COUNTY

-------------------------------------------------------------------X

ASSOCIATION OF FIRE DISTRICTS OF THE STATE
OF NEW YORK and EAST FISHKILL FIRE DISTRICT,
individually and on behalf of all others similarly situated,

Index No. _____/2023

**SUMMONS**

Trial by jury is desired in the
DUTCHESS County.

Venue is designated pursuant to
CPLR § 503(a) & (c) in that the
contamination occurred in this
county.

                              *Plaintiffs,*

-*against* -

THE 3M COMPANY, f/k/a Minnesota Mining and
Manufacturing Co., AGC CHEMICALS AMERICAS INC.,
AMEREX CORPORATION, ARKEMA INC.,
ARCHROMA U.S. INC., BASF CORPORATION,
individually and as successor in interest to Ciba Inc.,
BUCKEYE FIRE EQUIPMENT COMPANY, CARRIER
GLOBAL CORPORATION, CHEMDESIGN PRODUCTS
INC., CHEMGUARD INC. CHEMICALS, INC.,
CLARIANT CORPORATION, individually and as
successor in interest to Sandoz Chemical Corporation,
CORTEVA, INC., individually and as successor in interest
to DuPont Chemical Solutions Enterprise, DEEPWATER
CHEMICALS, INC., DUPONT DE NEMOURS INC.,
individually and as successor in interest to DuPont
Chemical Solutions Enterprise, DYNAX CORPORATION,
E. I. DUPONT DE NEMOURS AND COMPANY,
individually and as successor in interest to DuPont
Chemical Solutions Enterprise, KIDDE-FENWAL, INC.,
individually and as successor in interest to Kidde Fire
Fighting, Inc., NATION FORD CHEMICAL COMPANY,
NATIONAL FOAM, INC., THE CHEMOURS
COMPANY, individually and as successor in interest to
DuPont Chemical Solutions Enterprise, THE CHEMOURS
COMPANY FC, LLC, individually and as successor in
interest to DuPont Chemical Solutions Enterprise, and
TYCO FIRE PRODUCTS, LP, individually and as
successor in interest to The Ansul Company, and DOE
DEFENDANTS 1-20, fictitious names whose present
identities are unknown,

                              *Defendants.*

-------------------------------------------------------------------X

To the above-named Defendant:

You are hereby summoned to answer the Complaint in this action, and to serve a copy of your Answer, or, if the Complaint is not served with this Summons, to serve a Notice of Appearance on the Plaintiffs' attorneys within twenty (20) days after the service of this Summons, exclusive of the day of service, where service is made by delivery upon you personally within the state, or, within thirty (30) days after completion of service where service is made in any other manner. In case of your failure to appear or answer, judgment will be taken against you by default for the relief demanded in the Complaint.

Dated: New York, New York
        March 17, 2023

                                        Napoli Shkolnik, PLLC
                                        *Attorneys for Plaintiff*


                                        */s/ Patrick Lanciotti*
                                        Patrick Lanciotti, Esq.
                                        360 Lexington Avenue
                                        Eleventh Floor
                                        New York, NY 10017

To:

3M COMPANY
c/o Corporation Service Company
251 Little Falls Drive
Wilmington, New Castle, DE 19808

AGC CHEMICALS AMERICAS INC.
c/o The Corporation Trust Company
Corporation Trust Center
1209 Orange Street
Wilmington, DE 19801

AMEREX CORPORATION
c/o James M. Proctor II
2900 Highway 280
Suite 300
Birmingham, AL 35223

ARCHROMA U.S. INC.
c/o The Corporation Trust Company
Corporation Trust Center
1209 Orange Street
Wilmington, DE 19801

ARKEMA INC.
900 First Avenue
King of Prussia, PA 19406

BASF CORPORATION
c/o The Corporation Trust Company
Corporation Trust Center
1209 Orange Street
Wilmington, DE 19801

BUCKEYE FIRE EQUIPMENT COMPANY
c/o A Haon Corporate Agent, Inc.
29225 Chagrin Blvd, Suite 350
Pepper Pike, OH 44122

CARRIER GLOBAL CORPORATION
c/o The Corporation Trust Company

Case 7:23-cv-03329-CS   Document 1-1   Filed 04/20/23   Page 5 of 61

Corporation Trust Center
1209 Orange Street
Wilmington, DE 19801

CHEMDESIGN PRODUCTS INC.
c/o Corporation Service Company
251 Little Falls Drive
Wilmington, New Castle, DE, 19808

CHEMGUARD INC.
c/o The Prentice-Hall Corporation System, Inc.
251 Little Falls Drive
Wilmington, New Castle, DE, 19808

CHEMICALS, INC.
c/o Ashok K. Moza
12321 Hatcherville
Baytown, TX 77520

CLARIANT CORPORATION
c/o Corporation Service Company
8040 Excelsior Drive, Suite 400
Madison, WI 53717

CORTEVA, INC.
c/o The Corporation Trust Company
Corporation Trust Center
1209 Orange Street
Wilmington, DE 19801

DEEPWATER CHEMICALS, INC.
c/o The Corporation Trust Company
Corporation Trust Center
1209 Orange Street
Wilmington, DE 19801

DUPONT DE NEMOURS INC.
c/o The Corporation Trust Company
Corporation Trust Center
1209 Orange Street
Wilmington, DE 19801

DYNAX CORPORATION
c/o Corporate Systems LLC
3500 S. Dupont Highway
Dover, DE 19901

E. I. DUPONT DE NEMOURS AND COMPANY
c/o The Corporation Trust Company
Corporation Trust Center
1209 Orange Street
Wilmington, DE 19801

KIDDE-FENWAL, INC.
c/o The Corporation Trust Company
Corporation Trust Center
1209 Orange Street
Wilmington, DE 19801

NATION FORD CHEMICAL COMPANY
c/o John A. Dickson, IV
2300 Bank Street
Fort Mill, SC 29715

NATIONAL FOAM, INC.
c/o The Corporation Trust Company
Corporation Trust Center
1209 Orange Street
Wilmington, DE 19801

THE CHEMOURS COMPANY
c/o The Corporation Trust Company
Corporation Trust Center
1209 Orange Street
Wilmington, DE 19801

THE CHEMOURS COMPANY FC, LLC
c/o The Corporation Trust Company
Corporation Trust Center
1209 Orange Street
Wilmington, DE 19801

TYCO FIRE PRODUCTS LP
c/o The Corporation Trust Company

Corporation Trust Center
1209 Orange Street
Wilmington, DE 19801

Case 7:23-cv-03329-CS Document 1-1 Filed 04/20/23 Page 8 of 61

SUPREME COURT OF THE STATE OF NEW YORK
DUTCHESS COUNTY

----------------------------------------------------------------------X

ASSOCIATION OF FIRE DISTRICTS OF THE STATE
OF NEW YORK and EAST FISHKILL FIRE DISTRICT,
individually and on behalf of all others similarly situated,

               *Plaintiffs,*

-against -

THE 3M COMPANY, f/k/a Minnesota Mining and
Manufacturing Co., AGC CHEMICALS AMERICAS INC.,
AMEREX CORPORATION, ARKEMA INC.,
ARCHROMA U.S. INC., BASF CORPORATION,
individually and as successor in interest to Ciba Inc.,
BUCKEYE FIRE EQUIPMENT COMPANY, CARRIER
GLOBAL CORPORATION, CHEMDESIGN PRODUCTS
INC., CHEMGUARD INC. CHEMICALS, INC.,
CLARIANT CORPORATION, individually and as
successor in interest to Sandoz Chemical Corporation,
CORTEVA, INC., individually and as successor in interest
to DuPont Chemical Solutions Enterprise, DEEPWATER
CHEMICALS, INC., DUPONT DE NEMOURS INC.,
individually and as successor in interest to DuPont
Chemical Solutions Enterprise, DYNAX CORPORATION,
E. I. DUPONT DE NEMOURS AND COMPANY,
individually and as successor in interest to DuPont
Chemical Solutions Enterprise, KIDDE-FENWAL, INC.,
individually and as successor in interest to Kidde Fire
Fighting, Inc., NATION FORD CHEMICAL COMPANY,
NATIONAL FOAM, INC., THE CHEMOURS
COMPANY, individually and as successor in interest to
DuPont Chemical Solutions Enterprise, THE CHEMOURS
COMPANY FC, LLC, individually and as successor in
interest to DuPont Chemical Solutions Enterprise, TYCO
FIRE PRODUCTS, LP, individually and as successor in
interest to The Ansul Company, and JOHN DOE
DEFENDANTS 1-20,

               *Defendants.*

----------------------------------------------------------------------X

Index No. _____/2023

**COMPLAINT AND DEMAND
FOR JURY TRIAL**

Trial by jury is desired in the
DUTCHESS County.

Venue is designated pursuant to
CPLR § 503(a) & (c) in that the
contamination occurred in this
county.

## CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL

Plaintiffs ASSOCIATION OF FIRE DISTRICTS OF THE STATE OF NEW YORK and EAST FISHKILL FIRE DISTRICT (collectively, "Plaintiffs"), by and through their undersigned counsel, hereby file this Class Action Complaint, individually and on behalf of all others similarly situated, against Defendants, 3M COMPANY, f/k/a Minnesota Mining and Manufacturing Co., AGC CHEMICALS AMERICAS INC., AMEREX CORPORATION, ARKEMA INC., ARCHROMA U.S. INC., BASF CORPORATION, BUCKEYE FIRE EQUIPMENT COMPANY, CARRIER GLOBAL CORPORATION, CHEMDESIGN PRODUCTS INC., CHEMGUARD INC., CHEMICALS, INC., CLARIANT CORPORATION, CORTEVA, INC., DEEPWATER CHEMICALS, INC., DUPONT DE NEMOURS INC., DYNAX CORPORATION, E. I. DUPONT DE NEMOURS AND COMPANY, KIDDE-FENWAL, INC., NATION FORD CHEMICAL COMPANY, NATIONAL FOAM, INC., THE CHEMOURS COMPANY, THE CHEMOURS COMPANY FC, LLC, and TYCO FIRE PRODUCTS, LP, and DOE DEFENDANTS 1-20, fictitious names whose present identifies are unknown  (collectively "Defendants"), and allege, upon information and belief, as follows:

## INTRODUCTION

1.      This is a class action lawsuit brought by Plaintiffs Association of Fire Districts of the State of New York ("AFDSNY") and East Fishkill Fire District ("EFFD") on behalf of themselves and other similarly situated New York fire districts supported by the AFDSNY (collectively, the "Class Members") for injunctive, equitable, and declaratory relief arising from the intentional, knowing, reckless and/or negligent acts and/or omissions of Defendants that have led to widespread contamination caused by the use of aqueous film-forming foam ("AFFF") products that contained per- and poly-fluoroalkyl substances ("PFAS"), including perfluorooctane sulfonate ("PFOS") and perfluorooctanoic acid ("PFOA").

2

2.     PFOS and PFOA are fluorosurfactants that repel oil, grease, and water. PFOS, PFOA, and/or their chemical precursors, are or were components of AFFF products, which are firefighting suppressant agents used in training and firefighting activities for fighting Class B fires. Class B fires include fires involving hydrocarbon fuels such as petroleum or other flammable liquids.

3.     PFOS and PFOA are mobile, persist indefinitely in the environment, bioaccumulate in individual organisms and humans, and biomagnify up the food chain. PFOS and PFOA are also associated with multiple and significant adverse health effects in humans, including but not limited to kidney cancer, testicular cancer, high cholesterol, thyroid disease, ulcerative colitis, and pregnancy-induced hypertension.

4.     At various times from the 1960s through today, Defendants designed, manufactured, marketed, distributed, and/or sold AFFF products containing PFOS, PFOA, and/or their chemical precursors, and/or designed, manufactured, marketed, distributed, and/or sold the fluorosurfactants and/or perfluorinated chemicals ("PFCs") contained in AFFF (collectively, "AFFF/Component Products").

5.     Defendants designed, manufactured, marketed, distributed, and/or sold AFFF/Component Products with the knowledge that these toxic compounds would be released into the environment during fire protection, training, and response activities, even when used as directed and intended by Defendants.

6.     Since its creation in the 1960s, AFFF was designed, manufactured, marketed, distributed, and/or sold by Defendants, and/or that contained fluorosurfactants and/or PFCs designed, manufactured, marketed, distributed, and/or sold by Defendants, used as directed and

3

intended by Defendants, and subsequently released into the environment during fire protection, training, and response activities, resulting in widespread PFAS contamination.

7.      Airports, military installations, and municipal fire departments were unaware of the environmental and health risks and hazards of using Defendants' AFFF/Component Products-containing PFOA and PFOS for decades.  These sites have been linked to the widespread contamination of land, soil, surface water, and groundwater with PFOA, PFOS, and other PFCs throughout the country.

8.      Plaintiff AFDSNY is a New York non-profit corporation that works to improve the fiscal responsibility, efficiency, and effectiveness of fire district management through education, training, and advocacy for commissioners and other fire district officials in the 57 counties outside of the City of New York.

9.      The AFDSNY counts a total of 813 fire districts across the State of New York as members.

10.     The contamination caused by Defendants' AFFF/Component Products has undermined AFDSNY organizational activities, caused a drain on its resources, and required the organization to divert resources from other programs they could be funding to assist their members in furtherance of their overall mission.  Such a concrete and demonstrable disruption to AFDSNY's organizational activities, along with the corresponding drain on its resources, constitutes far more than simply a setback to the organization's abstract social interests.

11.     Plaintiff EFFD is a New York State public corporation and subdivision of the State of New York whose Headquarters and Training Facility is located at 2502 Route 52, Hopewell Junction, NY 12533.

12.     The EFFD is comprised of three fire companies—the Stormville Fire Company, the Hillside Lake Fire Company, Hopewell Hose Fire Company and the Wiccopee Fire Company— and two sub-stations—the Stormville Fire Company Sub-Station and the Wiccopee Fire Company Sub-Station—that cover a total of fifty-six (56) square miles in Dutchess County, New York, including Interstate 84, the Taconic State Parkway, and the Hudson Valle Research Park.

13.     On April 4, 2022, the Town of East Fishkill tested for PFAS the wells at the East Fishkill Fire Training Center and results showed detects in Well 2 of 2.64 ppt of PFOA and 1.93 ppt of PFOS and in Well 1 of 0.755 ppt of PFOA and 3.28 ppt of PFOS.

14.     The Class Members are other fire districts in the State of New York that are similarly situated to the EFFD because their property has also been contaminated with PFAS as a result of their use of AFFF during training exercises and to extinguish live Class B fires.

15.     Defendants' PFAS-containing AFFF/Component Products were used by the Plaintiffs and Class Members in their intended manner, without significant change in the products' condition.   Plaintiffs were unaware of the dangerous properties of the Defendants' AFFF/Component Products and relied on the Defendants' instructions as to proper handling of the products.

16.     PFOS and PFOA are fluorosurfactants that repel oil, grease, and water.  PFOS, PFOA, and/or their chemical precursors, are or were components of AFFF products, which are firefighting suppressant agents used in training and firefighting activities for fighting Class B fires. Class B fires include fires involving hydrocarbon fuels such as petroleum or other flammable liquids.

5

Case 7.23-cv-03329-CS   Document 1-1   Filed 04/20/23   Page 13 of 61

17.     On information and belief, Plaintiffs' and Class Members' properties were contaminated with PFAS through the use of AFFF during training exercises and to extinguish live Class B fires.

18.     On information and belief, Plaintiffs' and Class Members' contamination is a direct and proximate result of the repeated, long term, and widespread use of AFFF/Component Products manufactured and sold by Defendants in the State of New York.

19.     Due to the persistent and long-term nature of PFAS contamination, Plaintiffs and Class Members are expected to suffer damages and incur the costs associated with remediating the contamination caused by Defendants' PFAS-containing AFFF/Component Products.  Such action includes, but is not limited to, additional testing and monitoring for PFAS, as well as planning, designing, and implementing the remedial actions necessary to remove these chemicals from their land, soil, surface water, and/or groundwater.

20.     These and other costs will be incurred by Plaintiffs and Class Members as a direct and proximate result of Defendants' wrongful acts and omissions.

21.     Plaintiffs and Class Members should not have to bear these costs; they should be borne by the Defendants, who are responsible for the PFAS contamination.  Accordingly, Plaintiffs and Class Members seek injunctive, equitable and declaratory relief arising from the intentional, knowing, reckless and/or negligent acts and/or omissions of Defendants in connection with contamination of their properties with PFAS.

## STANDING AND JUSTICIABILITY

22.     The Court of Appeals has held that issues of standing are considered "an aspect of justiciability which, when challenged, must be considered at the outset of any litigation."  *Soc'y of Plastics Indus. v. Cty. of Suffolk*, 77 N.Y.2d 761, 769, 570 N.Y.S.2d 778, 782, 573 N.E.2d 1034, 1038 (1991)

6

23.     The Court of Appeals has likewise held that an association has standing to bring suit on behalf of its members when: (1) its members would otherwise have standing to sue in their own right; (2) the interests it seeks to protect are germane to the organization's purpose; and (3) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit.  *See id.* at 775.

24.     The AFDSNY's members are fire districts located in the State of New York that have all used and stored AFFF products containing PFOS and PFOA for fire suppression activities, unaware of the environmental and health risks of using Defendants' AFFF/Component Products. As a result of their use of AFFF, many of AFDSNY's members have had their properties contaminated with PFAS and either have already incurred or will incur substantial costs to remediate and/or remove that contamination.

25.     The AFDSNY's mission is to improve the fiscal responsibility efficiency, and effectiveness of fire district management through education, training, and advocacy for commissioners and other fire district officials.  In recent years, AFDSNY has been forced to devote portions of education and training to the risks posed by the use of PFAS-containing AFFF and how to address PFAS-related contamination.[1]

26.     Though this Complaint describes actual, concrete injuries suffered by Plaintiffs and Class Members as a result of Defendants' tortious conduct as alleged herein, the claims asserted and relief sought do not require the participation of individual AFDSNY members.

27.     The relief sought herein would redress the injuries suffered by Plaintiffs and Class Members by recovering damages for the PFAS contamination that is present, accumulating, and/or

---

[1] *See, e.g.*, AFDSNY, 2020 Annual Meeting Vendor Registration Packet, https://afdsny.org/docs/Vendor_Registration.pdf (last accessed Dec. 28, 2022) (including in the schedule for AFDSNY's 2020 annual meeting a presentation/panel on "Emerging Concerns About PFAS").

persisting on their respective properties as a result of Defendants' acts and/or omissions. Plaintiffs also have no other adequate remedy at law, making the relief sought herein necessary and appropriate.

## JURISDICTION AND VENUE

28.     Upon information and belief, this Court has personal jurisdiction over Defendants because each of them is doing business in New York by manufacturing, distributing, producing, and marketing products, services and/or materials in this State and/or to this State.

29.     At all relevant times to the Complaint, Defendants conducted business in New York and thereby availed themselves of the legal rights in New York.

30.     Defendants have had systematic and continuous commercial contacts with New York to establish jurisdiction over them pursuant to CPLR § 302.

31.     This Court has personal jurisdiction over the defendants as each of them are doing business in New York and engage in business in New York such that it is reasonably foreseeable that they would be subject to the jurisdiction of the courts of this State.

32.     This Court has personal jurisdiction over the Plaintiffs and Class Members they are corporations duly organized and existing under, and by virtue of the State of New York laws.

## PARTIES

### A.     Plaintiffs

33.     **Plaintiff AFDSNY** is a non-profit corporation organized under the laws of the State of New York, with its principal place of business located at the following address: P.O. Box 496 Selkirk, NY 12158.

34.     The AFDSNY works to improve the fiscal responsibility, efficiency and effectiveness of fire district management through education, training and advocacy for commissioners and other fire district officials in the 57 counties outside the City of New York.

8

35.    The AFDSNY counts a total of 813 fire districts across the State of New York as members.

36.    **Plaintiff EFFD** is a public corporation and subdivision organized under the laws of the State of New York, with its principal place of business located at 2502 Route 52, Hopewell Junction, NY 12533.

37.    The EFFD consists of the Stormville Fire Company, the Hillside Lake Fire Company, Hopewell Hose Fire Company and the Wiccopee Fire Company, which, together with the Stormville Fire Company and Wiccopee Fire Company Sub-Stations, provide fire protection services to an area covering a total of fifty-six (56) square miles in Dutchess County, New York.

### B.    Defendants

38.    The term "Defendants" refers to all Defendants named herein jointly and severally.

####      i.    The AFFF Defendants

39.    The term **"AFFF Defendants"** refers collectively to Defendants 3M Company, Angus International Safety Group, Ltd., Amerex Corporation, Buckeye Fire Equipment Company, Carrier Global Corporation, Central Sprinkler, LLC, Chemguard Inc., Fire Products GP Holding, LLC, Johnson Controls International PLC, Kidde-Fenwal, Inc., National Foam, Inc.., and Tyco Fire Products L.P.,

40.    **Defendant The 3M Company f/k/a Minnesota Mining and Manufacturing Co. ("3M")** is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business located at 3M Center, St. Paul, Minnesota 55144-1000.

41.    Beginning before 1970 and until at least 2002, 3M designed, manufactured, marketed, distributed, and sold AFFF containing PFAS, including but not limited to PFOA and PFOS.

9

42. **Defendant Amerex Corporation ("Amerex")** is a corporation organized and existing under the laws of the State of Alabama, with its principal place of business located at 7595 Gadsden Highway, Trussville, AL 35173.

43. Amerex is a manufacturer of firefighting products. Beginning in 1971, it was a manufacturer of hand portable and wheeled extinguishers for commercial and industrial applications.

44. In 2011, Amerex acquired Solberg Scandinavian AS, one of the largest manufacturers of AFFF products in Europe.

45. On information and belief, beginning in 2011, Amerex designed, manufactured, marketed distributed, and sold AFFF containing PFAS, including but not limited to PFOA and PFOS.

46. **Defendant Tyco Fire Products LP ("Tyco")** is a limited partnership organized under the laws of the State of Delaware, with its principal place of business located at One Stanton Street, Marinette, Wisconsin 54143-2542.

47. Tyco is the successor in interest of The Ansul Company ("Ansul"), having acquired Ansul in 1990.

48. Beginning in or around 1975, Ansul designed, manufactured, marketed, distributed, and sold AFFF containing PFAS, including but not limited to PFOA and PFOS.

49. After Tyco acquired Ansul in 1990, Tyco/Ansul continued to design, manufacture, market, distribute, and sell AFFF products containing PFAS, including but not limited to PFOA and PFOS.

50. **Defendant Chemguard, Inc. ("Chemguard")** is a corporation organized under the laws of the State of Texas, with its principal place of business located at One Stanton Street, Marinette, Wisconsin 54143.

51. On information and belief, Chemguard designed, manufactured, marketed, distributed, and sold AFFF products containing PFAS, including but not limited to PFOA and PFOS.

52. On information and belief, Chemguard was acquired by Tyco International Ltd. in 2011.

53. **Defendant Buckeye Fire Equipment Company ("Buckeye")** is a corporation organized under the laws of the State of Ohio, with its principal place of business located at 110 Kings Road, Kings Mountain, North Carolina 28086.

54. On information and belief, Buckeye designed, manufactured, marketed, distributed, and sold AFFF products containing PFAS, including but not limited to PFOA and PFOS.

55. **Defendant National Foam, Inc. ("National Foam")** is a corporation organized under the laws of the State of Delaware, with its principal place of business located at 141 Junny Road, Angier, North Carolina 27501.

56. Beginning in or around 1973, National Foam designed, manufactured, marketed, distributed, and sold AFFF containing PFAS, including but not limited to PFOA and PFOS.

57. On information and belief, National Foam currently manufactures the Angus brand of AFFF products and is a subsidiary of Angus International Safety Group.

58. On information and belief, National Foam merged with Chubb Fire Ltd. to form Chubb National Foam, Inc. in or around 1988.

11

59.     On information and belief, Chubb is or has been composed of different subsidiaries and/or divisions, including but not limited to, Chubb Fire & Security Ltd., Chubb Security, PLC, Red Hawk Fire & Security, LLC, and/or Chubb National Foam, Inc. (collectively referred to as "Chubb").

60.     On information and belief, Chubb was acquired by Williams Holdings in 1997.

61.     On information and belief, Angus Fire Armour Corporation had previously been acquired by Williams Holdings in 1994.

62.     On information and belief, Williams Holdings was demerged into Chubb and Kidde P.L.C. in or around 2000.

63.     On information and belief, when Williams Holdings was demerged, Kidde P.L.C. became the successor in interest to National Foam System, Inc. and Angus Fire Armour Corporation.

64.     On information and belief, Kidde P.L.C. was acquired by United Technologies Corporation in or around 2005.

65.     On information and belief, Angus Fire Armour Corporation and National Foam separated from United Technologies Corporation in or around 2013.

66.     **Defendant Kidde-Fenwal, Inc. ("Kidde-Fenwal")** is a corporation organized under the laws of the State of Delaware, with its principal place of business at One Financial Plaza, Hartford, Connecticut 06101.

67.     On information and belief, Kidde-Fenwal was an operating subsidiary of Kidde P.L.C. and manufactured AFFF following Kidde P.L.C.'s acquisition by United Technologies Corporation.

12

68.     On information and belief, Kidde-Fenwal is the entity that divested the AFFF business unit now operated by National Foam in 2013.

69.     **Defendant Carrier Global Corporation ("Carrier")** is a corporation organized under the laws of the State of Delaware, with its principal place of business at 13995 Pasteur Boulevard, Palm Beach Gardens, Florida 33418.

70.     On information and belief, Carrier was formed in March 2020 when United Technologies Corporation spun off its fire and security business before it merged with Raytheon Company in April 2020.

71.     On information and belief, Kidde-Fenwal became a subsidiary of Carrier when United Technologies Corporation spun off its fire and security business in March 2020.

72.     On information and belief, the AFFF Defendants designed, manufactured, marketed, distributed, and sold AFFF products containing PFOS, PFOA, and/or their chemical precursors that were stored, handled, used, trained with, tested equipment with, otherwise discharged, and/or disposed at Massachusetts.

ii.     The Fluorosurfactant Defendants

73.     The term **"Fluorosurfactant Defendants"** refers collectively to Defendants 3M, , Arkema Inc., BASF Corporation, ChemDesign Products Incorporated, Chemguard Inc., Deepwater Chemicals, Inc., E.I. DuPont de Nemours and Company, The Chemours Company, The Chemours Company FC, LLC, DuPont de Nemours Inc., and Dynax Corporation.

74.     **Defendant Arkema Inc.** is a corporation organized and existing under the laws of Pennsylvania, with its principal place of business at 900 First Avenue, King of Prussia, PA 19406.

75.     Arkema Inc. develops specialty chemicals and polymers.

76.     Arkema, Inc. is an operating subsidiary of Arkema France, S.A.

77.    On information and belief, Arkema Inc. designed, manufactured, marketed, distributed, and sold fluorosurfactants containing PFOS, PFOA, and/or their chemical precursors for use in AFFF products.

78.    **Defendant BASF Corporation ("BASF")** is a corporation organized under the laws of the State of Delaware, with its principal place of business located at 100 Park Avenue, Florham Park, New Jersey 07932.

79.    On information and belief, BASF is the successor-in-interest to Ciba. Inc. (f/k/a Ciba Specialty Chemicals Corporation).

80.    On information and belief, Ciba Inc. designed, manufactured, marketed, distributed, and sold fluorosurfactants containing PFOS, PFOA, and/or their chemical precursors for use in AFFF products.

81.    **Defendant ChemDesign Products Inc. ("ChemDesign")** is a corporation organized under the laws of Delaware, with its principal place of business located at 2 Stanton Street, Marinette, WI, 54143.

82.    On information and belief, ChemDesign designed, manufactured, marketed, distributed, and sold fluorosurfactants containing PFOS, PFOA, and/or their chemical precursors for use in AFFF products

83.    **Defendant Deepwater Chemicals, Inc. ("Deepwater")** is a corporation organized under the laws of Delaware, with its principal place of business located at 196122 E County Road 40, Woodward, OK, 73801.

84.    On information and belief, Deepwater Chemicals designed, manufactured, marketed, distributed, and sold fluorosurfactants containing PFOS, PFOA, and/or their chemical precursors for use in AFFF products

14

85.     **Defendant Dynax Corporation ("Dynax")** is a corporation organized under the laws of the State of Delaware, with its principal place of business located at 103 Fairview Park Drive, Elmsford, New York 10523.

86.     On information and belief, Dynax entered into the AFFF market on or about 1991 and quickly became a leading global producer of fluorosurfactants and fluorochemical stabilizers containing PFOS, PFOA, and/or their chemical precursors.

87.     On information and belief, Dynax designed, manufactured, marketed, distributed, and sold fluorosurfactants and fluorochemical stabilizers containing PFOS, PFOA, and/or their chemical precursors for use in AFFF products.

88.     **Defendant E.I. du Pont de Nemours & Company ("DuPont")** is a corporation organized under the laws of the State of Delaware, with its principal place of business located at 974 Centre Road, Wilmington, Delaware 19805.

89.     **Defendant The Chemours Company ("Chemours Co.")** is a limited liability company organized under the laws of the State of Delaware, with its principal place of business located at 1007 Market Street, P.O. Box 2047, Wilmington, Delaware, 19899.

90.     In 2015, DuPont spun off its performance chemicals business to Chemours Co., along with vast environmental liabilities which Chemours Co. assumed, including those related to PFOS and PFOA and fluorosurfactants.  On information and belief, Chemours Co. has supplied fluorosurfactants containing PFOS and PFOA, and/or their chemical precursors to manufacturers of AFFF products.

91.     On information and belief, Chemours Co. was incorporated as a subsidiary of DuPont as of April 30, 2015.  From that time until July 2015, Chemours Co. was a wholly-owned subsidiary of DuPont.

15

92.     In July 2015, DuPont spun off Chemours Co. and transferred to Chemours Co. its "performance chemicals" business line, which includes its fluoroproducts business, distributing shares of Chemours Co. stock to DuPont stockholders, and Chemours Co. has since been an independent, publicly-traded company.

93.     **Defendant The Chemours Company FC, LLC ("Chemours FC")** is a limited liability company organized under the laws of the State of Delaware, with its principal place of business located at 1007 Market Street, Wilmington, Delaware, 19899.

94.     **Defendant Corteva, Inc. ("Corteva")** is a corporation organized and existing under the laws of Delaware, with its principal place of business at 974 Centre Rd., Wilmington, Delaware 19805.

95.     **Defendant Dupont de Nemours Inc**. **f/k/a DowDuPont, Inc. ("Dupont de Nemours Inc.")** is a corporation organized and existing under the laws of Delaware, with its principal place of business at 974 Centre Road, Wilmington, Delaware 19805 and 2211 H.H. Dow Way, Midland, Michigan 48674.

96.     On June 1, 2019, DowDuPont separated its agriculture business through the spin-off of Corteva.

97.     Corteva was initially formed in February 2018. From that time until June 1, 2019, Corteva was a wholly-owned subsidiary of DowDuPont.

98.     On June 1, 2019, DowDuPont distributed to DowDuPont stockholders all issued and outstanding shares of Corteva common stock by way of a pro-rata dividend. Following that distribution, Corteva became the direct parent of E. I. Du Pont de Nemours & Co.

99.     Corteva holds certain DowDuPont assets and liabilities, including DowDuPont's agriculture and nutritional businesses.

16

100.     On June 1, 2019, DowDuPont, the surviving entity after the spin-off of Corteva and of another entity known as Dow, Inc., changed its name to DuPont de Nemours, Inc., to be known as DuPont ("New DuPont"). New DuPont retained assets in the specialty products business lines following the above-described spin-offs, as well as the balance of the financial assets and liabilities of E.I DuPont not assumed by Corteva.

101.     Defendants E. I. Du Pont de Nemours and Company; The Chemours Company; The Chemours Company FC, LLC; Corteva, Inc.; and DuPont de Nemours, Inc. are collectively referred to as "DuPont" throughout this Complaint.

102.     On information and belief, DuPont designed, manufactured, marketed, distributed, and sold fluorosurfactants containing PFOS, PFOA, and/or their chemical precursors for use in AFFF products.

103.     On information and belief, 3M and Chemguard also designed, manufactured, marketed, distributed, and sold fluorosurfactants containing PFOS, PFOA, and/or their chemical precursors for use in AFFF products.

104.     On information and belief, the Fluorosurfactant Defendants designed, manufactured, marketed, distributed, and sold fluorosurfactants containing PFOS, PFOA, and/or their chemical precursors for use in AFFF products that were stored, handled, used, trained with, tested equipment with, otherwise discharged, and/or disposed at Massachusetts.

iii.     The PFC Defendants

105.     The term **"PFC Defendants"** refers collectively to 3M, AGC Chemicals Americas Inc., Archroma U.S. Inc., ChemDesign Products Inc., Chemicals, Inc., Clariant Corporation, Deepwater Chemicals, Inc., E. I. DuPont de Nemours and Company, The Chemours Company, The Chemours Company FC, LLC, Corteva, Inc., DuPont de Nemours Inc., and Nation Ford Chemical Company.

17

106.    **Defendant AGC Chemicals Americas, Inc. ("AGC")** is a corporation organized and existing under the laws of Delaware, having its principal place of business at 55 East Uwchlan Avenue, Suite 201, Exton, PA 19341.

107.    On information and belief, AGC Chemicals Americas, Inc. was formed in 2004 and is a subsidiary of AGC Inc., a foreign corporation organized under the laws of Japan, with its principal place of business in Tokyo, Japan.

108.    AGC manufactures specialty chemicals. It offers glass, electronic displays, and chemical products, including resins, water and oil repellants, greenhouse films, silica additives, and various fluorointermediates.

109.    On information and belief, AGC designed, manufactured, marketed, distributed, and sold PFCs containing PFOS, PFOA, and/or their chemical precursors for use in manufacturing the fluorosurfactants used in AFFF products.

110.    **Defendant Archroma U.S., Inc. ("Archroma")** is a corporation organized and existing under the laws of Delaware, with its a principal place of business at 5435 77 Center Drive, Charlotte, North Carolina 28217.

111.    On information and belief, Archroma was formed in 2013 when Clariant Corporation divested its textile chemicals, paper specialties, and emulsions business to SK Capital Partners.

112.    On information and belief, Archroma designed, manufactured, marketed, distributed, and sold PFCs containing PFOS, PFOA, and/or their chemical precursors for use in manufacturing the fluorosurfactants used in AFFF products.

18

113.    **Defendant Chemicals, Inc. ("Chemicals, Inc.")** is a corporation organized and existing under the laws of Texas, with its principal place of business located at 12321 Hatcherville, Baytown, TX 77520.

114.    On information and belief, Chemicals, Inc. supplied PFCs containing PFOS, PFOA, and/or their chemical precursors for use in manufacturing the fluorosurfactants used in AFFF products.

115.    **Defendant Clariant Corporation ("Clariant")** is a corporation organized and existing under the laws of New York, with its principal place of business at 4000 Monroe Road, Charlotte, North Carolina 28205.

116.    On information and belief, Clariant is the successor in interest to the specialty chemicals business of Sandoz Chemical Corporation ("Sandoz").   On information and belief, Sandoz spun off its specialty chemicals business to form Clariant in 1995.

117.    On information and belief, Clariant supplied PFCs containing PFOS, PFOA, and/or their chemical precursors for use in manufacturing the fluorosurfactants used in AFFF products.

118.    **Defendant Nation Ford Chemical Co. ("Nation Ford")** is a corporation organized and existing under the laws of South Carolina, with its principal place of business located at 2300 Banks Street, Fort Mill, SC 29715.

119.    On information and belief, Nation Ford supplied PFCs containing PFOS, PFOA, and/or their chemical precursors for use in manufacturing the fluorosurfactants used in AFFF products.

120.    On information and belief, 3M, ChemDesign, Deepwater Chemicals, and DuPont also supplied PFCs containing PFOS, PFOA, and/or their chemical precursors for use in manufacturing the fluorosurfactants used in AFFF products.

121.    On information and belief, the Fluorochemical Defendants supplied PFCs containing PFOS, PFOA, and/or their chemical precursors for use in manufacturing the fluorosurfactants used in AFFF products that were stored, handled, used, trained with, tested equipment with, otherwise discharged, and/or disposed at Massachusetts.

### iv.    Doe Defendants 1-20

122.    Doe Defendants 1-20 are unidentified entities or persons whose names are presently unknown and whose actions, activities, omissions  (a) may have permitted, caused and/or contributed to the contamination of Plaintiffs's water sources or supply wells; or (b) may be vicariously responsible for entities or persons who permitted, caused and/or contributed to the contamination of Plaintiffs's water sources or supply wells;  or (c) may be successors in interest to entities or persons who permitted, caused and/or permitted , contributed to the contamination of Plaintiffs's water sources or supply wells. After reasonable search and investigation to ascertain the Doe Defendants actual names, the Doe Defendants' actual identities are unknown to Plaintiffs as they are not linked with any of the Defendants on any public source.

123.    The Doe Defendants 1-20 either in their own capacity or through a party they are liable for: (1) designed, manufactured, marketed, distributed, and/or sold AFFF products containing PFOS, PFOA, and/or their chemical precursors, and/or designed, manufactured, marketed, distributed, and/or sold the fluorosurfactants and/or PFCs contained in AFFF/Component Products; or (2) used, handled, transported, stored, discharged, disposed of, designed, manufactured, marketed, distributed, and/or sold PFOS, PFOA, and/or their chemical precursors, or other non-AFFF products containing PFOS, PFOA, and/or their chemical precursors; or (3) failed to timely perform necessary and reasonable response and remedial measures to releases of PFOS, PFOA, and/or their chemical precursors, or other non-AFFF

20

Case 7:23-cv-03329-CS   Document 1-1   Filed 04/20/23   Page 28 of 61

products containing PFOS, PFOA, and/or their chemical precursors in to the environment in which Plaintiffs's water supplies and well exist.

124.    All Defendants, at all times material herein, acted by and through their respective agents, servants, officers and employees, actual or ostensible, who then and there were acting within the course and scope of their actual or apparent agency, authority or duties. Defendants are liable based on such activities, directly and vicariously.

125.    Defendants represent all or substantially all of the market for AFFF/Component Products at Massachusetts.

## FACTUAL ALLEGATIONS RELEVANT TO ALL CAUSES OF ACTION

### A.    PFOA and PFOS and Their Risk to Public Health

126.    PFAS are chemical compounds containing fluorine and carbon. These substances have been used for decades in the manufacture of, among other things, household and commercial products that resist heat, stains, oil, and water. These substances are not naturally occurring and must be manufactured.

127.    The two most widely studied types of these substances are PFOA and PFOS.

128.    PFOA and PFOS have unique properties that cause them to be: (i) mobile and persistent, meaning that they readily spread into the environment where they break down very slowly; (ii) bioaccumulative and biomagnifying, meaning that they tend to accumulate in organisms and up the food chain; and (iii) toxic, meaning that they pose serious health risks to humans and animals.

129.    PFOA and PFOS easily dissolve in water, and thus they are mobile and easily spread in the environment. PFOA and PFOS also readily contaminate soils and leach from the soil into groundwater, where they can travel significant distances.

21

130.    PFOA and PFOS are characterized by the presence of multiple carbon-fluorine bonds, which are exceptionally strong and stable. As a result, PFOA and PFOS are thermally, chemically, and biologically stable. They resist degradation due to light, water, and biological processes.

131.    Bioaccumulation occurs when an organism absorbs a substance at a rate faster than the rate at which the substance is lost by metabolism and excretion. Biomagnification occurs when the concentration of a substance in the tissues of organisms increases as the substance travels up the food chain.

132.    PFOA and PFOS bioaccumulate/biomagnify in numerous ways. First, they are relatively stable once ingested, so that they bioaccumulate in individual organisms for significant periods of time. Because of this stability, any newly ingested PFOA and PFOS will be added to any PFOA and PFOS already present. In humans, PFOA and PFOS remain in the body for years.

133.    PFOA and PFOS biomagnify up the food chain. This occurs, for example, when humans eat fish that have ingested PFOA and/or PFOS.

134.    The chemical structure of PFOA and PFOS makes them resistant to breakdown or environmental degradation. As a result, they are persistent when released into the environment.

135.    Exposure to PFAS is toxic and poses serious health risks to humans and animals.

136.    PFAS are readily absorbed after consumption or inhalation and accumulate primarily in the bloodstream, kidney, and liver.

137.    Data exists to indicate that the presence, accumulation, toxic invasion, and/or persistence of PFAS in human blood is injurious and physically harmful.  At all relevant times, Defendants, through their acts and/or omissions, controlled, minimized, trivialized, manipulated, and/or otherwise influenced the information that was published in peer-review journals, released

22

by any governmental entity, and/or otherwise made available to the public relating to PFAS materials in human blood and any alleged adverse impacts and/or risks associated therewith, effectively preventing Plaintiffs or Class Members from learning of the risks associated with PFAS-containing AFFF.

138.    At all relevant times, Defendants, through their acts and/or omissions, concealed and/or withheld information from their customers, governmental entities, and the public that would have properly and fully alerted Plaintiffs and Class Members about the environmental and human health risks associated with PFAS-containing AFFF.

**B.    Defendants' Manufacture and Sale of AFFF/Component Products**

139.    AFFF is a type of water-based foam that was first developed in the 1960s to extinguish hydrocarbon fuel-based fires.

140.    AFFF is a Class-B firefighting foam. It is mixed with water and used to extinguish fires that are difficult to fight, particularly those that involve petroleum or other flammable liquids.

141.    AFFF is synthetically formed by combining fluorine-free hydrocarbon foaming agents with fluorosurfactants. When mixed with water, the resulting solution produces an aqueous film that spreads across the surface of hydrocarbon fuel. This film provides fire extinguishment and is the source of the designation aqueous film-forming foam.

142.    Beginning in the 1960s, the AFFF Defendants designed, manufactured, marketed, distributed, and/or sold AFFF products that used fluorosurfactants containing either PFOS, PFOA, or the chemical precursors that degrade into PFOS and PFOA.

143.    AFFF can be made without the fluorosurfactants that contain PFOA, PFOS, and/or their precursor chemicals. Fluorine-free firefighting foams, for instance, do not release PFOA, PFOS, and/or their precursor chemicals into the environment.

23

144.    AFFF that contains fluorosurfactants, however, is better at extinguishing hydrocarbon fuel-based fires due to their surface-tension lowering properties, essentially smothering the fire and starving it of oxygen.

145.    The fluorosurfactants used in 3M's AFFF products were manufactured by 3M's patented process of electrochemical fluorination ("ECF").

146.    The fluorosurfactants used in other AFFF products sold by the AFFF Defendants were manufactured by the Fluorosurfactant Defendants through the process of telomerization.

147.    The PFCs the Fluorosurfactant Defendants needed to manufacture those fluorosurfactants contained PFOS, PFOA, and/or their chemical precursors and were designed, manufactured, marketed, distributed and/or sold by the PFC Defendants.

148.    On information and belief, the PFC and Fluorosurfactant Defendants were aware that the PFCs and fluorosurfactants they designed, manufactured, marketed, distributed, and/or sold would be used in the AFFF products designed, manufactured, marketed, distributed, and/or sold by the AFFF Defendants.

149.    On information and belief, the PFC and Fluorosurfactant Defendants designed, manufactured, marketed, distributed, and/or sold the PFC and/or fluorosurfactants contained in the AFFF products discharged into the environment during fire protection, training, and response activities in the State of New York, resulting in widespread PFAS contamination.

150.    On information and belief, the AFFF Defendants designed, manufactured, marketed, distributed, and/or sold the AFFF products discharged into the environment during fire protection, training, and response activities in the State of New York, resulting in widespread PFAS contamination.

24

### C.   Defendants' Knowledge of the Threats to Public Health and the Environment Posed by PFOS and PFOA

151.   On information and belief, by at least the 1970s 3M and DuPont knew or should have known that PFOA and PFOS are mobile and persistent, bioaccumulative and biomagnifying, and toxic.

152.   On information and belief, 3M and DuPont concealed from the public and government agencies its knowledge of the threats to public health and the environment posed by PFOA and PFOS.

153.   Some or all of the Defendants understood how stable the fluorinated surfactants used in AFFF are when released into the environment from their first sale to a customer, yet they failed to warn their customers or provide reasonable instruction on how to manage wastes generated from their products.

i.   1940s and 1950s: Early Warnings About the Persistence of AFFF

154.   In 1947, 3M started its fluorochemical program, and within four years, it began selling its PFOA to DuPont. The persistence and contaminating nature of the fluorosurfactants contained in AFFF products were understood prior to their commercial application at 3M's Cottage Grove facility in Minnesota.

155.   The inventor of 3M's ECF process was J.H. Simons. Simons' 1948 patent for the ECF process reported that PFCs are "non-corrosive, and of little chemical reactivity," and "do not react with any of the metals at ordinary temperatures and react only with the more chemically reactive metals such as sodium, at elevated temperatures."[2]

---

[2] Simons, J. H., Fluorination of Organic Compounds, U.S. Patent No. 2,447,717. August 24, 1948, *available at* https://www.ag.state.mn.us/Office/Cases/3M/docs/PTX/PTX1005.pdf.

156.    Simons further reported that fluorosurfactants produced by the ECF process do not react with other compounds or reagents due to the blanket of fluorine atoms surrounding the carbon skeleton of the molecule.    3M understood that the stability of the carbon-to-fluorine bonds prevented its fluorosurfactants from undergoing further chemical reactions or degrading under natural processes in the environment.[3]

157.    The thermal stability of 3M's fluorosurfactants was also understood prior to commercial production.  Simons' patent application further discloses that the fluorosurfactants produced by the ECF process were thermally stable at temperatures up to 750° C (1382° F). Additional research by 3M expanded the understanding of the thermal stability of perfluorocarbon compounds.[4]

158.    Nowhere in any Material Safety Data Sheet for any of Defendants' AFFF/Component Products is information on the thermal stability of those products disclosed. Failure to disclose knowledge of the stability of the PFCs and fluorosurfactants used in AFFF products to customers is a failure to warn just how indestructible the AFFF's ingredients are when released to unprotected water sources and even treatment plants.

        ii.    1960s: AFFF's Environmental Hazards Come Into Focus

159.    By at least the end of the 1960s, additional research and testing performed by 3M and DuPont indicated that fluorosurfactants, including at least PFOA, because of their unique chemical structure, were resistant to environmental degradation and would persist in the environment essentially unaltered if allowed to enter the environment.

---

[3] Simons, J. H., 1950. Fluorocarbons and Their Production. Fluorine Chemistry, 1(12): 401-422, *available* at https://www.ag.state.mn.us/Office/Cases/3M/docs/PTX/PTX3008.pdf.

[4] Bryce, T. J., 1950. Fluorocarbons - Their Properties and Wartime Development. Fluorine Chemistry, 1(13): 423-462.

160.     One 3M employee wrote in 1964: "This chemical stability also extends itself to all types of biological processes; <u>there are no known biological organisms that are able to attack the carbon-fluorine bond in a fluorocarbon.</u>"[5]  Thus, 3M knew by the mid-1960s that its surfactants were immune to chemical and biological degradation in soils and groundwater.

161.     3M also knew by 1964 that when dissolved, fluorocarbon carboxylic acids and fluorocarbon sulfonic acids dissociated to form highly stable perfluorocarboxylate and perfluorosulfonate ions.  Later studies by 3M on the adsorption and mobility of FC-95 and FC-143 (the ammonium salt of PFOA) in soils indicated very high solubility and very high mobility in soils for both compounds.[6]

> iii.     <u>1970s: Internal Studies Provide Evidence of Environmental and Health Risks</u>

162.     By 1950, 3M knew that the fluorosurfactants used in its AFFF product(s) would not degrade when released to the environment but would remain intact and persist.  Two decades later—and after the establishment of a robust market of AFFFs using fluorosurfactants—3M finally got around to looking at the environmental risks that fluorosurfactants posed.

163.     An internal memo from 3M in 1971 states that "the thesis that there is 'no natural sink' for fluorocarbons obviously demands some attention."[7]  Hence, 3M understood at the very least that the fluorosurfactant used in its AFFF products would, in essence, never degrade once it was released into the environment.

---

[5] Bryce, H.G., Industrial and Utilitarian Aspects of Fluorine Chemistry (1964), *available* at https://www.ag.state.mn.us/Office/Cases/3M/docs/PTX/PTX3022.pdf.

[6] Technical Report Summary re : Adsorption of FC 95 and FC143 on Soil, Feb. 27, 1978, *available at* https://www.ag.state.mn.us/Office/Cases/3M/docs/PTX/PTX1158.pdf.

[7] Memorandum from H.G. Bryce to R.M. Adams re : Ecological Aspects of Fluorocarbons, Sept. 13, 1971, *available at* https://www.ag.state.mn.us/Office/Cases/3M/docs/PTX/PTX1088.pdf.

Case 7:23-cv-03329-CS   Document 1-1   Filed 04/20/23   Page 35 of 61

164.    By the mid-1970s, 3M and Ansul (and possibly other Defendants) had an intimate understanding of the persistent nature of PFCs. A 1976 study, for example, observed no biodegradation of FC-95, the potassium salt of PFOS; a result 3M characterized as "unsurprising" in light of the fact that "[b]iodegradation of FC 95 is improbable because it is completely fluorinated."[8]

165.    In 1977, Ansul authored a report titled "Environmentally Improved AFFF," which acknowledged that releasing AFFF into the environment could pose potential negative impacts to groundwater quality.[9] Ansul wrote: "The purpose of this work is to explore the development of experimental AFFF formulations that would exhibit reduced impact on the environment while retaining certain fire suppression characteristic . . . improvements [to AFFF formulations] are desired in the environmental area, i.e., development of compositions that have a reduced impact on the environment without loss of fire suppression effectiveness." Thus, Ansul knew by the mid-1970s that the environmental impact of AFFF needed to be reduced, yet there is no evidence that Ansul (or any other Defendant) ever pursued initiatives to do so.

166.    A 1978 3M biodegradation study likewise reported that an "extensive study strongly suggest[ed]" one of its PFCs is "likely to persist in the environment for extended period unaltered by metabolic attack."[10] A year later, a 3M study reported that one of its fluorosurfactants "was found to be completely resistant to biological test conditions," and that it appeared waterways were the fluorosurfactant's "environmental sink."[11]

---

[8] Technical Report Summary, August 12, 1976 [3MA01252037].

[9] Ansul Co., Final Report: Environmentally Improved AFFF, N00173-76-C-0295, Marinette, WI, Dec. 13, 1977, *available at* https://apps.dtic.mil/dtic/tr/fulltext/u2/a050508.pdf.

[10] Technical Report Summary re : Fate of Fluorochemicals in the Environment, Biodegradation Studies of Fluorocarbons - II, Jan. 1, 1978, *available at* https://www.ag.state.mn.us/Office/Cases/3M/docs/PTX/PTX1153.pdf.

[11] Technical Report Summary re : Fate of Fluorochemicals in the Environment, Biodegradation Studies of

28

Case 7:23-cv-03329-CS   Document 1-1   Filed 04/20/23   Page 36 of 61

167.    In 1979, 3M also completed a comprehensive biodegradation and toxicity study covering investigations between 1975 and 1978.[12]  More than a decade after 3M began selling AFFF containing fluorosurfactants it wrote: "there has been a general lack of knowledge relative to the environmental impact of these chemicals."  The report ominously asked, "If these materials are not biodegradable, what is their fate in the environment?"

168.    During the 1970s, 3M also learned that the fluorosurfactants used in AFFF accumulated in the human body and were "even more toxic" than previously believed.

169.    In 1975, 3M learns that PFAS was present in the blood of the general population.[13] Since PFOA and PFOS are not naturally occurring, this finding should have alerted 3M to the possibility that their products were a source of this PFOS.  The finding also should have alerted 3M to the possibility that PFOS might be mobile, persistent, bioaccumulative, and biomagnifying, as those characteristics could explain how PFOS from 3M's products ended up in human blood.

170.    In 1976, 3M found PFAS in the blood of its workers at levels "up to 1000 times 'normal' amounts of organically bound fluorine in their blood."[14]  This finding should have alerted 3M to the same issues raised by the prior year's findings.

---

Fluorocarbons - III, July 19, 1978, *available at*
https://www.ag.state.mn.us/Office/Cases/3M/docs/PTX/PTX1179.pdf.

[12] Technical Report Summary, Final Comprehensive Report on FM 3422, Feb. 2, 1979, *available at* https://www.ag.state.mn.us/Office/Cases/3M/docs/PTX/PTX2563.pdf.

[13] Memorandum from G.H. Crawford to L.C. Krogh et al. re: Fluorocarbons in Human Blood Plasma, Aug. 20, 1975, *available at* https://www.ag.state.mn.us/Office/Cases/3M/docs/PTX/PTX1118.pdf.

[14] 3M Chronology – Fluorochemicals in Blood, Aug. 26, 1977, *available at* https://www.ag.state.mn.us/Office/Cases/3M/docs/PTX/PTX1144.pdf.

171.    Studies by 3M in 1978 showed that PFOA reduced the survival rate of fathead minnow fish eggs,[15] that PFOS was toxic to monkeys,[16] and that PFOS and PFOA were toxic to rats.[17]  In the study involving monkeys and PFOS, all of the monkeys died within days of ingesting food contaminated with PFOS.

172.    In 1979, 3M and DuPont discussed 3M's discovery of PFOA in the blood of its workers and came to the same conclusion that there was "no reason" to notify the EPA of the finding.[18]

       iv.    1980s and 1990s: Evidence of AFFF's Health Risks Continues to Mount

173.    By at least the end of the 1980s, additional research and testing performed by Defendants, including at least 3M and DuPont, indicated that elevated incidence of certain cancers and other adverse health effects, including elevated liver enzymes and birth defects, had been observed among workers exposed to such materials, including at least PFOA, but such data was not published, provided to governmental entities as required by law, or otherwise publicly disclosed at the time.

174.    In 1981, DuPont tested for and found PFOA in the blood of female plant workers Parkersburg, West Virginia. DuPont observed and documented pregnancy outcomes in exposed

---

[15] The Effects of Continuous Aqueous Exposure to 78.03 on Hatchability of Eggs and Growth and Survival of Fry of Fathead Minnow, June 1978, *available at* https://www.ag.state.mn.us/Office/Cases/3M/docs/PTX/PTX1176.pdf.

[16] Ninety-Day Subacute Rhesus Monkey Toxicity Study, Dec. 18, 1978, *available at* https://www.ag.state.mn.us/Office/Cases/3M/docs/PTX/PTX1191.pdf; Aborted FC95 Monkey Study, Jan. 2, 1979, *available at* https://www.ag.state.mn.us/Office/Cases/3M/docs/PTX/PTX1193.pdf.

[17] Acute Oral Toxicity ($LD_{50}$) Study in Rats (FC-143), May 5, 1978, *available at* https://www.ag.state.mn.us/Office/Cases/3M/docs/PTX/PTX1170.pdf; FC-95, FC-143 and FM-3422 – 90 Day Subacute Toxicity Studies Conducted at IRDC – Review of Final Reports and Summary, Mar. 20, 1979, *available at* https://www.ag.state.mn.us/Office/Cases/3M/docs/PTX/PTX1199.pdf.

[18] Memorandum from R.A. Prokop to J.D. Lazerte re: Disclosure of Information on Levels of Fluorochemicals in Blood, July 26, 1979, *available at* https://www.ag.state.mn.us/Office/Cases/3M/docs/PTX/PTX2723.pdf.

workers, finding two of seven children born to female plant workers between 1979 and 1981 had birth defects—one an "unconfirmed" eye and tear duct defect, and one a nostril and eye defect.[19]

175. In 1983, 3M researchers concluded that concerns about PFAS "give rise to concern for environmental safety," including "legitimate questions about the persistence, accumulation potential, and ecotoxicity of fluorochemicals in the environment."[20] That same year, 3M completed a study finding that PFOS caused the growth of cancerous tumors in rats.[21] This finding was later shared with DuPont and led them to consider whether "they may be obliged under their policy to call FC-143 a carcinogen in animals."[22]

176. In 1984, 3M documented a trend of increasing levels of PFOS in the bodies of 3M workers, leading one of the company's medical officers to warn in an internal memo: "we must view this present trend with serious concern. It is certainly possible that . . . exposure opportunities are providing a potential uptake of fluorochemicals that exceeds excretion capabilities of the body."[23]

177. A 1997 material safety data sheet ("MSDS") for a non-AFFF product made by 3M listed its only ingredients as water, PFOA, and other perfluoroalkyl substances and warned that the product includes "a chemical which can cause cancer." The MSDS cited "1983 and 1993 studies

---

[19] C-8 Blood Sampling Results, *available at* http://tiny.cc/v8z1mz.

[20] 3M Environmental Laboratory (EE & PC), Fate of Fluorochemicals - Phase II, May 20, 1983, *available at* https://www.ag.state.mn.us/Office/Cases/3M/docs/PTX/PTX1284.pdf.

[21] Two Year Oral (Diet) Toxicity/Carcinogenicity Study of Fluorochemical FC-143 in Rats, Volume 1 of 4, Aug. 29, 1987, *available at* https://www.ag.state.mn.us/Office/Cases/3M/docs/PTX/PTX1337.pdf.

[22] Memorandum from R.G. Perkins to F.D. Griffith re: Summary of the Review of the FC-143 Two-Year Feeder Study Report to be presented at the January 7, 1988 meeting with DuPont, January 5, 1988, *available at* https://www.ag.state.mn.us/Office/Cases/3M/docs/PTX/PTX1343.pdf.

[23] Memorandum from D.E. Roach to P.F. Riehle re: Organic Fluorine Levels, Aug. 31, 1984, *available at* https://www.ag.state.mn.us/Office/Cases/3M/docs/PTX/PTX1313.pdf.

conducted jointly by 3M and DuPont" as support for this statement. On information and belief, the MSDS for 3M's AFFF products did not provide similar warnings or information.

> v.    Defendants Hid What They Knew from the Government and the Public.

178.    Federal law requires chemical manufacturers and distributors to immediately notify the EPA if they have information that "reasonably supports the conclusion that such substance or mixture presents a substantial risk of injury to health or the environment." Toxic Substances Control Act ("TSCA") § 8(e), 15 U.S.C. § 2607(e)

179.    In April 2006, 3M agreed to pay EPA a penalty of more than $1.5 million after being cited for 244 violations of the TSCA, which included violations for failing to disclose studies regarding PFOS, PFOA, and other PFCs dating back decades.

180.    Likewise, in December 2005, the EPA announced it was imposing the "Largest Environmental Administrative Penalty in Agency History" against DuPont based on evidence that it violated the TSCA by concealing the environmental and health effects of PFOA.

181.    On information and belief, Defendants knew or should have known that AFFF containing PFOA or PFOS would very likely injure and/or threaten public health and the environment, even when used as intended or directed.

182.    Defendants failed to warn of these risks to the environment and public health, including the impact of their AFFF/Component Products on the quality of unprotected water sources.

183.    Defendants were all sophisticated and knowledgeable in the art and science of designing, formulating, and manufacturing AFFF/Component Products. They understood far more about the properties of their AFFF/Component Products—including the potential hazards they posed to human health and the environment—than any of their customers. Still, Defendants declined to use their sophistication and knowledge to design safer products.

32

### D. The Impact of PFOS and PFOA on the Environment and Human Health Is Finally Revealed

184.    As discussed above, neither 3M, DuPont, nor, on information and belief, any other Defendant complied with their obligations to notify EPA about the "substantial risk of injury to health or the environment" posed by their AFFF/Component Products. *See* TSCA § 8(e).

185.    Despite decades of research, 3M first shared its concerns with EPA in the late 1990s. In a May 1998 report submitted to EPA, "3M chose to report simply that PFOS had been found in the blood of animals, which is true but omits the most significant information," according to a former 3M employee.[24]

186.    On information and belief, 3M began in 2000 to phase out its production of products that contained PFOS and PFOA in response to pressure from the EPA.

187.    Once the truth about PFOS and PFOA was revealed, researchers began to study the environmental and health effects associated with them, including a "C8 Science Panel" formed out of a class action settlement arising from contamination from DuPont's Washington Works located in Wood County, West Virginia.

188.    The C8 panel consisted of three epidemiologists specifically tasked with determining whether there was a probable link between PFOA exposure and human diseases. In 2012, the panel found probable links between PFOA and kidney cancer, testicular cancer, ulcerative colitis, thyroid disease, pregnancy-induced hypertension (including preeclampsia), and hypercholesterolemia.

189.    Human health effects associated with PFOS exposure include immune system effects, changes in liver enzymes and thyroid hormones, low birth weight, high uric acid, and high

---

[24] Letter from R. Purdy, Mar. 28, 1999, *available at* https://www.ag.state.mn.us/Office/Cases/3M/docs/PTX/PTX1001.pdf.

33

cholesterol. In laboratory testing on animals, PFOA and PFOS have caused the growth of tumors, changed hormone levels, and affected the function of the liver, thyroid, pancreas, and immune system.

190.    The injuries caused by PFAS can arise months or years after exposure.

191.    Even after the C8 Science Panel publicly announced that human exposure to 50 parts per trillion, or more, of PFOA in drinking water for one year or longer had "probable links" with certain human diseases, including kidney cancer, testicular cancer, ulcerative colitis, thyroid disease, preeclampsia, and medically-diagnosed high cholesterol, Defendants repeatedly assured and represented to governmental entities, their customers, and the public (and continue to do so) that the presence of PFOA in human blood at the levels found within the United States presents no risk of harm and is of no legal, toxicological, or medical significance of any kind.

192.    Furthermore, Defendants have represented to and assured such governmental entities, their customers, and the public (and continue to do so) that the work of the independent C8 Science Panel was inadequate to satisfy the standards of Defendants to prove such adverse effects upon and/or any risk to humans with respect to PFOA in human blood.

193.    At all relevant times, Defendants, through their acts and/or omissions, controlled, minimized, trivialized, manipulated, and/or otherwise influenced the information that was published in peer-review journals, released by any governmental entity, and/or otherwise made available to the public relating to PFAS in human blood and any alleged adverse impacts and/or risks associated therewith, effectively preventing the public from discovering the existence and extent of any injuries/harm as alleged herein.

34

194.     On May 2, 2012, the EPA published its Third Unregulated Contaminant Monitoring Rule ("UCMR3"), requiring public water systems nationwide to monitor for thirty contaminants of concern between 2013 and 2015, including PFOS and PFOA.[25]

195.     In the May 2015 "Madrid Statement on Poly- and Perfluoroalkyl Substances (PFAS's)," scientists and other professionals from a variety of disciplines, concerned about the production and release into the environment of PFOA, called for greater regulation, restrictions, limits on the manufacture and handling of any PFOA containing product, and to develop safe non-fluorinated alternatives to these products to avoid long-term harm to human health and the environment.[26]

196.     On May 25, 2016, the EPA released a lifetime health advisory level (HAL) for drinking water and health effects support documents for PFOS and PFOA.[27] *See* Fed. Register, Vol. 81, No. 101, May 25, 2016.  The EPA developed the HAL to assist governmental officials in protecting public health when PFOS and PFOA are present in drinking water. The EPA HAL identified the concentration of PFOS and PFOA in drinking water at or below which adverse health effects are not anticipated to occur over a lifetime of exposure at 0.07 ppb or 70 ppt. The HAL was based on peer-reviewed studies of the effects of PFOS and PFOA on laboratory animals (rats and mice) and was also informed by epidemiological studies of human populations exposed to PFOS.

---

[25] *Revisions to the Unregulated Contaminant Monitoring Regulation (UCMR 3) for Public Water Systems*, 77 Fed. Reg: 26072 (May 2, 2012).

[26] Blum A, Balan SA, Scheringer M, Trier X, Goldenman G, Cousins IT, Diamond M, Fletcher T, Higgins C, Lindeman AE, Peaslee G, de Voogt P, Wang Z, Weber R. 2015. The Madrid statement on poly- and perfluoroalkyl substances (PFASs). Environ Health Perspect 123:A107–A111; http://dx.doi.org/10.1289/ehp.1509934.

[27] *See* Fed. Register, Vol. 81, No. 101, May 25, 2016, Lifetime Health Advisories and Health Effects Support Documents for Perfluorooctanoic Acid and Perfluorooctane Sulfonate.

These studies indicated that exposure to PFOS and PFOA over the HAL could result in adverse health effects, including:

    a. Developmental effects to fetuses during pregnancy or to breastfed infants (e.g., low birth weight, accelerated puberty, skeletal variations);

    b. Cancer (testicular and kidney);

    c. Liver effects (tissue damage);

    d. Immune effects (e.g., antibody production and immunity);

    e. Thyroid disease and other effects (e.g., cholesterol changes).

197.    In 2016, the National Toxicology Program of the United States Department of Health and Human Services ("NTP") and the International Agency for Research on Cancer ("IARC") both released extensive analyses of the expanding body of research regarding the adverse effects of PFCs. The NTP concluded that both PFOA and PFOS are "presumed to be an immune hazard to humans" based on a "consistent pattern of findings" of adverse immune effects in human (epidemiology) studies and "high confidence" that PFOA and PFOS exposure was associated with suppression of immune responses in animal (toxicology) studies.[28]

198.    IARC similarly concluded that there is "evidence" of "the carcinogenicity of . . . PFOA" in humans and in experimental animals, meaning that "[a] positive association has been observed between exposure to the agent and cancer for which a causal interpretation is . . . credible."[29]

___

[28] See U.S. Dep't of Health and Human Services, Nat'l Toxicology Program, *NTP Monograph: Immunotoxicity Associated with Exposure to Perfluorooctanoic Acid or Perfluorooctane Sulfonate* (Sept. 2016), at 1, 17, 19, *available at* https://ntp.niehs.nih.gov/ntp/ohat/pfoa_pfos/pfoa_pfosmonograph_508.pdf

[29] See Int'l Agency for Research on Cancer, IARC Monographs: *Some Chemicals Used as Solvents and in Polymer Manufacture* (Dec. 2016), at 27, 97, *available at* http://monographs.iarc.fr/ENG/Monographs/vol110/mono110.pdf.

36

E.      **AFFF Use and PFAS Contamination at the EFFD**

199.    The EFFD was formed in October of 1935.

200.    The EFFD consists of Stormville Fire Company; the Hillside Lake Fire Company; the Stormville Fire Company Sub-Station; Hopewell Hose Fire Company; the Wiccopee Fire Company and the Wiccopee Fire Company Sub-Station.

201.    The EFFD's Headquarters and Training Facility is located at 2502 Route 52, Hopewell Junction, NY 12533.

202.    The EFFD has approximately 300 firefighters and covers 56 square miles including Interstate 84, the Taconic State Parkway, and the Hudson Valle Research Park.

203.    On information and belief, the EFFD has been used to provide training to fire departments and fire districts.

204.    On information and belief, Defendants' AFFF/Component Products were stored, used, and discharged at EFFD for years as part of the training exercises hosted.

205.    On April 4, 2022, the Town of East Fishkill tested for PFAS the wells at the East Fishkill Fire Training Center and results showed detects in Well 2 of 2.64 ppt of PFOA and 1.93 ppt of PFOS and in Well 1 of 0.755 ppt of PFOA and 3.28 ppt of PFOS.

206.    On information and belief, Plaintiff's contamination is a direct and proximate result of fire protection, training, and response activities at EFFD that used AFFF, resulting in the migration of PFAS into Plaintiff's water supplies.

F.      **AFFF Containing PFOS and PFOA Is Fungible and Commingled in the Groundwater**

207.    AFFF containing PFOS and/or PFOA, once it has been released to the environment, lacks characteristics that would enable identification of the company that manufactured that particular batch of AFFF or chemical feedstock.

37

208.    A subsurface plume, even if it comes from a single location, such as a retention pond or fire training area, originates from mixed batches of AFFF and chemical feedstock coming from different manufacturers.

209.    Because precise identification of the specific manufacturer of any given AFFF/Component Product that was a source of the PFAS found at HBFD is nearly impossible, given certain exceptions, Plaintiff must pursue all Defendants, jointly and severally.

210.    Defendants are also jointly and severally liable because they conspired to conceal the true toxic nature of PFOS and PFOA, to profit from the use of AFFF/Component Products containing PFOS and PFOA, at Plaintiff's expense, and to attempt to avoid liability.

## MARKET SHARE LIABILITY, ALTERNATIVE LIABILITY, CONCERT OF ACTION, AND ENTERPRISE LIABILITY

211.    Defendants in this action are manufacturers that control a substantial share of the market for AFFF/Component Products containing PFOS, PFOA, and/or their chemical precursors in Massachusetts.  Market share liability attaches to all Defendants and the liability of each should be assigned according to its percentage of the market for AFFF/Component Products at issue in this Complaint.

212.    Because PFAS is fungible, it is impossible to identify the exact Defendant who manufactured any given AFFF/Component Product containing PFOS, PFOA, and/or their chemical precursors found free in the air, soil or groundwater, and each of these Defendants participated in a territory-wide and U.S. national market for AFFF/Component Products during the relevant time.

213.    Concert of action liability attaches to all Defendants, each of which participated in a common plan to commit the torts alleged herein and each of which acted tortuously in pursuance

38

of the common plan to knowingly manufacture and sell inherently dangerous AFFF/Component Products containing PFOS, PFOA, and/or their chemical precursors.

214.    Enterprise liability attaches to all the named Defendants for casting defective products into the stream of commerce.

## CLASS ACTION ALLEGATIONS

215.    Plaintiffs and Class Members bring this action and seek to certify and maintain it as a class action on behalf of themselves and on behalf of all others similarly situated as members of a proposed class (the "Class") pursuant to Article 9 of the New York Civil Practice Law and Rules, Section 901.

216.    Subject to amendment and additional discovery, the proposed Class consists of any fire district located in the State of New York that:

a.   stored and/or used PFAS-containing AFFF on its property;

b.   has detectable amounts of PFOA and/or PFOS on its property; and

c.   is a current member of the AFDSNY.

217.    Excluded from the Class are:

a.   Defendants, including any entity or division in which Defendant has controlling interest, along with Defendant's legal representative, employees, officers, directors, assigns, heirs, successors, and wholly or partly owned subsidiaries or affiliates;

b.   the Judge to whom this is case is assigned, the Judge's staff, and the Judge's immediate family;

c.   any class counsel or their immediate family members;

d.   fire districts located in the State of New York that have PFOA and/or PFOS contamination from sources other than AFFF; and

e.   fire districts located in the State of New York that have PFOA and/or PFOS contamination but are not current members of the AFDSNY.

218.    The proposed Class includes the EFFD and otherwise consists of members whose interests are germane to the AFDSNY's purpose of improving the fiscal responsibility, efficiency and effectiveness of fire district management through education, training and advocacy for commissioners and other fire district officials in the 57 counties outside the City of New York.

219.    Plaintiffs reserve the right to amend the Class definitions if discovery and further investigation reveal that the Class or any Subclass should be expanded, divided into additional subclasses, or modified in any other way.  This action satisfies the numerosity, commonality, typicality, adequacy, predominance, and superiority requirements.

### A.    Numerosity and Ascertainability

220.    This action meets the numerosity requirement because, upon information and belief, the number of fire districts that are members of the AFDSNY and have been impacted by AFFF-related PFAS contamination is in the hundreds, making individual joinder of Class Members' respective claims impracticable.  Although the exact number of Class Members is not yet known, a precise number can be ascertained from the AFDSNY, the State of New York, the New York Department of Environmental Conservation, and/or the New York Department of Health through public records and/or other appropriate discovery.

221.    The resolution of the claims of the Class Members in a single action will provide substantial benefits to all parties and the Court.  Further, Class Members can be notified of the pendency of this action by Court-approved notice methods.

### B.    Typicality

222.    Plaintiffs' claims are typical of the claims of Class Members and arise from the same course of conduct by Defendants.

223.    Plaintiffs' claims and those of the other Class Members have a common origin and share a common basis.  Like the proposed Class, Plaintiffs support the interests of those fire

40

districts whose properties have been contaminated with PFAS through the storage and use of AFFF for extinguishing Class B fires and for training purposes. And like the proposed Class, Plaintiffs properties have PFAS detections. This and other injuries were caused by the same wrongful and tortious conduct undertaken by Defendants, who have acted in the same way towards Plaintiffs as they have the other Class Members.

224.    The facts and circumstances surrounding Defendants' actions and misconduct are common to all Class Members and represent a common thread of misconduct resulting in common injury to all Class Members. The relief Plaintiff seeks is typical of the relief sought for absent Class Members.

225.    While the degree of exposure may differ across Class Members, factual inconsistences between the class members are not enough to defeat typicality. Since the named Plaintiffs assert reflective of those of Class Members, the factor of typicality is satisfied.

### C.    Adequacy of Representation

226.    Plaintiffs will fairly and adequately represent the interests of the Class as required by CPLR § 901(a)(4).

227.    Plaintiffs' claims are typical of the Class and they have no interests that are adverse to those of the Class Members.

228.    Plaintiffs have retained counsel competent and well experienced in class action and environmental tort litigation.

229.    Plaintiffs and their counsel are committed to vigorously prosecuting this action on behalf of the Class and have the financial resources to do so.

### D.    Commonality

230.    There are numerous questions of law and fact common to Plaintiffs and Class Members that predominate over any question affecting only individual Class Members, making it

41

appropriate to bring this action under CPLR § 901. The answers to these common questions will advance resolution of the litigation as to all Class Members. These common legal and factual issues include the following:

    a.  Whether Defendants engaged in the conduct alleged herein;

    b.  Whether Defendants knew or should have known that exposure to PFOS, PFOA, and/or their chemical precursors could increase health risks;

    c.  Whether Defendants knew or should have known that their manufacture of AFFF/Component Products containing PFOS, PFOA, and/or their chemical precursors was unreasonably dangerous;

    d.  Whether Defendants knew or should have known that their AFFF/Component Products contained persistent, stable, and mobile chemicals that were likely cause contamination;

    e.  Whether Defendants failed to sufficiently warn users of the potential for harm that resulted from use of their AFFF/Component Products;

    f.  Whether Defendants became aware of health and environmental harm caused by their AFFF/Component Products containing PFOS, PFOA, and/or their chemical precursors, and failed to warn users, Plaintiffs, and the Class Members;

    g.  The extent to which Defendants knew about PFAS contamination at fire districts in New York;

    h.  Whether the Defendants owed Plaintiffs/Plaintiffs and Class Members a duty to refrain from the actions that caused the PFAS contamination at fire districts in New York;

    i.  Whether Defendants made unlawful and misleading representations or material omissions with respect to the health impacts of PFAS;

    j.  Whether Plaintiffs and Class Members have suffered property damage caused by AFFF containing PFAS used for extinguishing Class B fires and for training purposes;

    k.  Whether Plaintiffs and Class Members are entitled to damages and other monetary relief and other equitable relief, including but not limited to punitive damages, and if so, in what amount;

    l.  Whether Defendants are strictly liable to Plaintiffs and the Class Members for their actions; and

42

m. Whether Defendants were unjustly enriched by their actions at the expense of Plaintiffs and the Class Members.

### E.     Superiority

231.    The class action mechanism is superior to any other available means of the fair and efficient adjudication of this case.  Further, no unusual difficulties are likely to be encountered in the management of this class action.  Given the great number of fire districts who were impacted by Defendants' AFFF/Component Products, it is impracticable for Plaintiffs and the Class Members to individually litigate their respective claims, as doing so would risk inconsistent judgments and the potential for increased delays and expense for the parties and the court system. Therefore, the class action mechanism presents considerably less management challenges and provides the efficiency of a single adjudication overseen by a single court.

## CAUSES OF ACTION

### COUNT 1:
### DEFECTIVE DESIGN

232.    Plaintiffs adopt, reallege, and incorporate the allegations in paragraphs 1 through 231 above, and further allege the following:

233.    As manufacturers of AFFF/Component Products containing PFOS, PFOA, and/or their chemical precursors, Defendants owed a duty to all persons whom its products might foreseeably harm, including Plaintiffs, and not to market any product which is unreasonably dangerous in design for its reasonably anticipated use.

234.    Defendants' AFFF/Component Products were unreasonably dangerous for its reasonably anticipated uses for the following reasons:

a. PFAS causes extensive groundwater contamination, even when used in its foreseeable and intended manner;

b. Even at extremely low levels, PFAS render drinking water unfit for consumption;

43

    c.   PFAS poses significant threats to public health; and

    d.   PFAS create real and potential environmental damage.

235.    Defendants knew of these risks and failed to use reasonable care in the design of their AFFF/Component Products.

236.    AFFF containing PFOS, PFOA, and/or their chemical precursors poses a greater danger to the environment and to human health than would be expected by ordinary persons such as Plaintiffs and the general public.

237.    At all times, Defendants were capable of making AFFF/Component Products that did not contain PFOS, PFOA, and/or their chemical precursors. Thus, reasonable alternative designs existed which were capable of preventing Plaintiffs' injuries.

238.    The risks posed by AFFF containing PFOS, PFOA, and/or their chemical precursors far outweigh the products' utility as a flame-control product.

239.    The AFFF containing PFAS that was designed, manufactured, marketed, distributed, and sold by the Defendants was so hazardous, toxic, and dangerous to human health that the act of designing, formulating, manufacturing, marketing, distributing, and selling this AFFF was unreasonably dangerous under the circumstances.

240.    As a direct and proximate result of Defendants' unreasonably dangerous design, manufacture, and sale of AFFF/Component Products containing PFOS, PFOA, and/or their chemical precursors, property owned by Plaintiffs and Class Members has been contaminated with PFOS, PFOA, and/or their chemical precursors and requires costly remediation efforts to remove that contamination.

241.    Defendants knew that it was substantially certain that their acts and omissions described above would contaminate property owned by Plaintiffs and Class Members. Defendants

committed each of the above-described acts and omissions knowingly, willfully, and/or with fraud, oppression, or malice, and with conscious and/or reckless disregard for Plaintiffs' property rights.

## COUNT 2:
## FAILURE TO WARN

242.    Plaintiffs adopt, reallege and incorporate the allegations in paragraphs 1 through 241 above, and further allege the following:

243.    As manufacturers of AFFF/Component Products containing PFOS, PFOA, and/or their chemical precursors, Defendants had a duty to provide adequate warnings of the risks of these products to all persons whom its product might foreseeably harm, including Plaintiffs/Plaintiffss and the public.

244.    Defendants' AFFF/Component Products were unreasonably dangerous for its reasonably anticipated uses for the following reasons:

  a.  PFAS causes extensive groundwater contamination, even when used in its foreseeable and intended manner;

  b.  Even at extremely low levels, PFAS render drinking water unfit for consumption;

  c.  PFAS poses significant threats to public health; and

  d.  PFAS create real and potential environmental damage.

245.    Defendants knew of the health and environmental risks associated with their AFFF/Component Products and failed to provide a warning that would lead an ordinary reasonable user or handler of a product to contemplate the dangers associated with their products or an instruction that would have avoided Plaintiffs' injuries.

246.    Despite Defendants' knowledge of the environmental and human health hazards associated with the use of their AFFF/Component Products Defendants failed to issue any warnings,

45

instructions, recalls, or advice regarding their AFFF/Component Products to Plaintiffs, governmental agencies or the public.

247.    As a direct and proximate result of Defendants' failure to warn, property owned by Plaintiffs and Class Members has been contaminated with PFOS, PFOA, and/or their chemical precursors and requires costly remediation efforts to remove that contamination.

248.    Defendants knew that it was substantially certain that their acts and omissions described above would contaminate property owned by Plaintiffs and Class Members. Defendants committed each of the above-described acts and omissions knowingly, willfully, and/or with fraud, oppression, or malice, and with conscious and/or reckless disregard for Plaintiffs' health and safety.

## COUNT 3:
## NEGLIGENCE

249.    Plaintiffs adopt, reallege and incorporate the allegations in paragraphs 1 through 248 above, and further allege the following:

250.    As manufacturers of AFFF/Component Products containing PFOS, PFOA, and/or their chemical precursors, Defendants owed a duty to Plaintiffs and to all persons whom its products might foreseeably harm and to exercise due care in the formulation, manufacture, sale, labeling, warning, and use of PFAS-containing AFFF.

251.    Defendants owed a duty to Plaintiffs to act reasonably and not place inherently dangerous AFFF/Component Products into the marketplace.

252.    Defendants knew or should have known that PFAS were leaching from AFFF used for fire protection, training, and response activities.

253.    Defendants knew or should have known that selling and distributing AFFF/Component Products was inherently dangerous to the public.

46

254.    Defendants knew or should have known that the manner in which they were designing, manufacturing, marketing, distributing, and selling their AFFF/Component Products would result in the contamination of property owned by Plaintiffs and Class Members with PFOS, PFOA, and/or their chemical precursors.

255.    Despite the fact that Defendants knew or should have known that PFAS are toxic, can contaminate water resources and are carcinogenic, Defendants negligently:

a.  designed, manufactured, formulated, handled, labeled, instructed, controlled, marketed, promoted, and/or sold AFFF/Component Products containing PFOS, PFOA, and/or their chemical precursors;

b.  issued deficient instructions on how their AFFF/Component Products should be used and disposed of, failing to instruct the public of risks associated with the products;

c.  failed to use reasonable care in the testing of the products;

d.  failed and refused to issue the appropriate warning and/or recalls to the users of their AFFF/Component Products;

e.  failed to use reasonable care in marketing, promoting, and advertising the products; and

f.  otherwise negligently or carelessly designing, manufacturing, marketing, distributing, warning, and selling a product which was inherently dangerous to the public.

256.    The magnitude of the burden on the Defendants to guard against this foreseeable harm to Plaintiffs and Class Members was minimal, as the practical consequences of placing this burden on the Defendants amounted to a burden to provide adequate instructions, proper labeling, and sufficient warnings about their AFFF/Component Products.

257.    As manufacturers, Defendants were in the best position to provide adequate instructions, proper labeling, and sufficient warnings about their AFFF/Component Products, and to take steps to eliminate, correct, or remedy the potential risk of PFAS contamination resulting from the use and discharge of PFAS-containing AFFF into the environment.

47

258.     As a direct and proximate result of Defendants' negligence, Plaintiffs and Class Members have sustained economic loss and damages including but not limited to loss of property value, remediation costs and expenses, and/or other damages.

259.     Defendants knew that it was substantially certain that their acts and omissions described above would contaminate property owned by Plaintiffs and Class Members.  Defendants committed each of the above-described acts and omissions knowingly, willfully, and/or with fraud, oppression, or malice, and with conscious and/or reckless disregard for Plaintiffs' health and safety.

<u>COUNT 4:</u>
**ACTUAL FRAUDULENT TRANSFER (DuPont and Chemours Co.)**

260.     Plaintiffs adopt, reallege and incorporate the allegations in paragraphs 1 through 259 above, and further allege the following:

261.     Through their effectuation of the Spinoff, Chemours Co. and DuPont (the "Fraudulent Transfer Defendants") caused Chemours Co. to transfer valuable assets to DuPont, including but not limited to the $3.9 billion dividend (the "Transfers"), while simultaneously assuming significant liabilities (the "Assumed Liabilities").

262.     The Transfers and Assumed Liabilities were made for the benefit of DuPont.

263.     At the time that the Transfers were made and the Liabilities were assumed, and until the Spinoff was complete, DuPont was in a position to, and in fact did, control and dominate Chemours Co.

264.     The Fraudulent Transfer Defendants made the Transfers and incurred the Assumed Liabilities with the actual intent to hinder, delay, and defraud the creditors or future creditors of Chemours Co.

265.     Plaintiffs and Class Members have been harmed as a result of the conduct of the Fraudulent Transfer Defendants.

48

266.   Plaintiffs and Class Memberare entitled to avoid the Transfers and to recover property or value transferred to DuPont.

<u>**COUNT 5:**</u>
**CONSTRUCTIVE FRAUDULENT TRANSFER (DuPont and Chemours Co.)**

267.   Plaintiffs adopt, reallege and incorporate the allegations in paragraphs 1 through 266 above, and further allege the following:

268.   Chemours Co. did not receive reasonably equivalent value from DuPont in exchange for the Transfers and Assumed Liabilities.

269.   Each of the Transfers and the assumption of the Assumed Liabilities by Chemours Co. was made to or for the benefit of DuPont.

270.   At the time that the Transfers were made, and the Assumed Liabilities were assumed, and until the Spinoff was complete, DuPont was in a position to, and in fact did, control and dominate Chemours Co.

271.   The Fraudulent Transfer Defendants made the Transfers and assumed the Assumed Liabilities when Chemours Co. was engaged or about to be engaged in a business for which its remaining assets were unreasonably small in relation to its business.

272.   Chemours Co. was insolvent or in contemplation of insolvency at the time of the Transfers, or became insolvent as a result of the Transfers and its assumption of the Assumed Liabilities.

273.   At the time that the Transfers were made, and Chemours Co. assumed the Assumed Liabilities, the Fraudulent Transfer Defendants intended to incur, or believed or reasonably should have believed, that Chemours Co. would incur debts beyond its ability to pay as they became due.

274.   Plaintiffs and Class Members have been harmed as a result of the Transfers.

49

275.     Plaintiffs and Class Members are entitled to avoid the Transfers and to recover property or value transferred to DuPont.

## COUNT 7:
## DECLARATORY JUDGEMENT UNDER THE DECLARATORY JUDGEMENT ACT

276.     Plaintiffs adopt, reallege and incorporate the allegations in paragraphs 1 through 275 above, and further allege the following:

277.     An actual, substantial, and justiciable controversy has arisen and exists between Plaintiffs, Class Members, and Defendants herein and their respective rights, obligations, and duties with respect to Defendants' contamination of property owned by Plaintiffs and Class Members with PFOS, PFOA, and/or their chemical precursors.

278.     By reason of the foregoing, Plaintiffs and Class Members seek a declaratory judgement that Defendants are liable and responsible for the property damage and resulting remediation costs caused by the PFOA and/or PFOS detected on their respective properties, all equitable and/or injunctive relief, and such other relief as the Court may Order, that the Court deems reasonable and appropriate in relation thereto.

## COUNT 8:
## FRAUDULENT CONCEALMENT

279.     Plaintiffs adopt, reallege and incorporate the allegations in paragraphs 1 through 278 above, and further allege the following:

280.     Throughout the relevant time period, Defendants knew that their products were defective and unreasonably unsafe for their intended purpose.

281.     Defendants fraudulently concealed from and/or failed to disclose to or warn the Plaintiff, and the public that their products were defective, unsafe, and unfit for the purposes intended, and that they were not of merchantable quality.

50

Case 7:23-cv-03329-CS   Document 1-1   Filed 04/20/23   Page 58 of 61

282.    Defendants owed a duty to Plaintiffs, Class Members, and the public to disclose and warn of the defective and harmful nature of the products because:

      a.   Defendants were in a superior position to know the true quality of the Defendants' product in documents and marketing materials; and

      b.   Defendants knowingly made false claims about the safety and quality of the Defendants' product in documents and marketing materials; and

      c.   Defendants fraudulently and affirmatively concealed the defective nature of the Defendants' products from the Plaintiff.

283.    The facts concealed and/or not disclosed by Defendants to Plaintiffs and Class Members were material facts that a reasonable person would have considered to be important in deciding whether or not to purchase and/or use the Defendants' products.

284.    Defendants intentionally concealed and/or failed to disclose the true defective nature of the products so that Plaintiffs and Class Members would use said products.  Plaintiffs justifiably acted or relied upon, to Plaintiffs' detriment, the concealed and/or non-disclosed facts as evidenced by Plaintiffs and Class Members' use of Defendants' products.

285.    Defendants, by concealment or other action, intentionally prevented Plaintiffs and Class Members from acquiring material information regarding the lack of safety and effectiveness of Defendants' products and are subject to the same liability to Plaintiffs and Class Members for their pecuniary losses, as though Defendants had stated the non-existence of such material information regarding Defendants' products' lack of safety and effectiveness and dangers and defects, and as though Defendants had affirmatively stated the non-existence of such matters that Plaintiffs and Class Members were thus prevented from discovering the truth. Defendants therefore have liability for fraudulent concealment under all applicable laws, including, inter alia, Restatement (Second) of Torts §550 (1977).

51

286.     As a proximate result of Defendants' conduct, Plaintiffs and Class Members have been injured and sustained economic loss and damages, including but not limited to loss of property value, remediation costs and expenses, and/or other damages.

## COUNT 9:
## PUNITIVE DAMAGES

287.     Plaintiffs allege, allegation in the paragraphs 1 through 286 above, and further allege the following:

288.     Defendants engaged in willful, wanton, malicious, and or/reckless conduct that caused the foregoing damage upon Plaintiffs, disregarding their protected rights.

289.     Defendants' willful, wanton, malicious, and/or reckless conduct includes but is not limited to Defendants' failure to take all reasonable measures to ensure PFAS would not be released into the environment and inevitably contaminate property owned by Plaintiffs and Class Members with PFAS.

290.     Defendants have caused great harm to Plaintiffs and Class Members, acting with implied malice and an outrageously conscious disregard for Plaintiffs and Class Members' property rights, such that the imposition of punitive damages is warranted.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs ASSOCIATION OF FIRE DISTRICTS OF THE STATE OF NEW YORK and EAST FISHKILL FIRE DISTRICT demand judgment against Defendants, and each of them, jointly and severally, and request the following relief from the Court:

a.   an order certifying the proposed Class, designating Plaintiffs as the named representatives of the proposed Class, and designating undersigned counsel as Class Counsel; and

b.   a declaration that Defendants acted with negligence, gross negligence, and/or willful, wanton, and careless disregard for the property rights of Plaintiffs and Class Members;

52

c.  an order finding Defendants liable for fraudulent concealment in the manner described herein;

d.  a declaratory judgement finding Defendants liable for the injuries and injunctive relief described herein;

e.  an order for an award of attorney fees and costs, as provided by law;

f.  pre-judgment and post-judgment interest as provided by law;

g.  an order barring the transfer of DuPont's liabilities for the claims brought in this Complaint;

h.  an award of punitive damages in an amount sufficient to deter Defendants' similar wrongful conduct in the future;

i.  an award of consequential damages; and

j.  an order for all such other relief the Court deems just and proper.

## DEMAND FOR JURY TRIAL

Plaintiffs ASSOCIATION OF FIRE DISTRICTS OF THE STATE OF NEW YORK and EAST FISHKILL FIRE DISTRICT demand a trial by jury of all issues so triable as a matter of right.


Dated: New York, New York
        March 17, 2023

Respectfully submitted,

**NAPOLI SHKOLNIK**

By:*/s/ Patrick Lanciotti*
Patrick Lanciotti, Esq.
Andrew Croner, Esq.
Nicholas Mindicino, Esq.
360 Lexington Avenue, 11th Fl.
New York, New York 10017
(212) 397-1000
planciotti@napolilaw.com
acroner@napolilaw.com
nmindicino@napolilaw.com

Paul J. Napoli, Esq.
1302 Avenida Ponce de León
Santurce, Puerto Rico 00907

53

(833) 271-4502
pnapoli@nsprlaw.com

54